1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | CASE NO. 4:22-CR-00081-51 |
|---|---|---|
| | § | HOUSTON, TEXAS |
| VERSUS | § | TUESDAY, |
| | § | MARCH 8, 2022 |
| RAUL MANUEL DELACRUZ | § | 3:32 P.M. TO 4:33 P.M. |

DETENTION HEARING/ARRAIGNMENT

BEFORE THE HONORABLE CHRISTINA A. BRYAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                          (SEE NEXT PAGE)

ELECTRONIC RECORDING OFFICER:    CLAUDIA GUTIERREZ

COURTROOM CLERK:                 MELISSA MORGAN

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

APPEARANCES:

FOR THE GOVERNMENT:                    US ATTORNEY'S OFFICE
                                       Christine Jiadai Lu, Esq.
                                       1000 Louisiana Street
                                       Suite 2300
                                       Houston, Texas  77002
                                       713-567-9486


FOR THE DEFENDANT:                     MAYR LAW, PC
                                       Thomas Brent Mayr, Esq.
                                       5300 Memorial Drive
                                       Suite 750
                                       Houston, Texas  77007
                                       713-808-9613


ALSO ATTENDING:
                                       PRETRIAL SERVICES OFFICER
                                       Sabrina Delgado

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| JAMES EMERSON | | | | |
| By Ms. Lu: | 5 | | 35 | |
| By Mr. Mayr: | | 20 | | 39 |

| EXHIBITS: | Offered | Received |
|---|---|---|
| Pretrial Report (sealed) | 42 | 42 |

4

**HOUSTON, TEXAS; TUESDAY, MARCH 8, 2022; 3:32 P.M.**

THE COURT:  All right.  Are we ready to proceed --

MS. LU:  Yes, Your Honor.

THE COURT:  -- with the detention hearing for Mr. Raul Manuel Delacruz?

MS. LU:  Yes, Your Honor.

MR. MAYR:  We're ready.

THE COURT:  All right.

MS. LU:  The United States calls James Emmerson.

THE COURT:  Okay.  And, Counsel, let me just have you announce your appearances.

MS. LU:  I apologize.  Christine Lu for the United States.

MR. MAYR:  And Brent Mayr, on behalf of Mr. Delacruz.  Let me go ahead and -- can we bring him to counsel table, Your Honor?

THE COURT:  Yes, yes.  And, Agent Emmerson, go ahead and come forward and be sworn.

THE WITNESS:  Where do you want -- I'm moving out -- I'm moving myself out of the way.

THE COURT:  I'll have you stand up here and then Ms. Morgan is going to swear you in.

THE CLERK:  Raise your right hand.

(Witness sworn.)

MS. LU:  And, Your Honor, would you like me to

step to the lectern to question or from here?

THE COURT:  It's up to you, Ms. Lu.

But we don't need an interpreter for Mr. Delacruz.

MR. MAYR:  We do not.

THE COURT:  Okay.

MS. LU:  Okay.  May I proceed?

THE COURT:  Yes, you may.

MS. LU:  Thank you, Your Honor.  All right.

DIRECT EXAMINATION OF JAMES EMMERSON

BY MS. LU:

Q    Mr. Emerson, would you please introduce yourself to the Court?

A    My name is James Emmerson.  It's with two Ms, E-M-M-E-R-S-O-N.

Q    All right.  And what do you do, Mr. Emerson?

A    I'm employed by the Galveston Police Department.  I've been there for approximately almost 19 years and I've been assigned at the DEA Galveston resident office for almost 13 years.

Q    Okay.  And can you tell the Court what are your duties and your various roles?

A    Investigate drug trafficking, money laundering.  Solely that's it.  Nothing else but drugs and drug trafficking organizations.

Q    Can you tell us, when you say, "drug trafficking

organizations," what level of organization are you -- do you focus on investigating?

A    Typically ones that are with higher amount of drugs, ones that originate out of source countries, international drug trafficking organizations, ones that also originate out of Mexico and just the quantities, typically kilogram quantities of cocaine, methamphetamine, heroin, fentanyl all those types of drugs.

Q    Got it.  And you said you started out with Galveston PD 19 years ago.

        Was it 19 years ago?

A    Yes, ma'am.

Q    Okay.  Did you have to work your way up to becoming a task force officer with DEA?

A    Yes, ma'am.  Prior to the Police Department, I was in the Marine Corps.  While I was at the Police Department, I worked a variety of roles from patrol, to interdiction, to field training officer and then to eventually as a narcotics detective and then I was assigned to DEA.

Q    Okay.  And in that time in the last few years as a task force officer, what sorts of investigative tools have you used to conduct your investigations?

A    Everything, pretty much from working in a uncover capacity well over 100 times, Title III wiretaps.  I've written four and managed around close to 100 wiretaps during

my 13 years at DEA.  Everything from search warrants, to location pings, PIN registers, physical surveillance, just a whole host of everything.

Q    Okay.  And with all that training and experience investigating high-level narcotics trafficking, did you apply that training and that experience to your investigation of the individuals named in this case today?

A    Yes, ma'am.

Q    All right.  Specifically I'd like to focus on a person by the name of Raul Delacruz.

Did you investigate someone by that name?

A    Yes, ma'am.

Q    Okay.  Can you tell the Court how you began investigating him?

A    So initially we started with multiple Title III wiretaps, which lead us to a wiretap over one of the co-defendants, Jossymar Mar-Zuniga.  During the wiretap, which was authorized around July of 2021, we intercepted several communications about a 6-kilogram cocaine deal that was going to take place at a residence off Kenilwood (phonetic) Street in Houston, Texas and at that time, that's when we encountered the co-defendant, Mr. Delacruz.

Q    Well, you kind of summarized everything by saying you worked up to getting some Title III wire interceptions on certain people's phones.  What is that process?

A    So for this specific one, for Jossymar Mar-Zuniga, we're actually on a wiretap on one of the other co-defendants in this case, which is Sammy Saldivar.  The process for the wiretap was extensive, everything from having the recorded telephone calls to that actual specific target device telephone to showing and proving that they're in communication with other persons that were involved in drug trafficking and money laundering.  And then a whole host of necessities, which included everything, surveillance and uncover operations, confidential informants.  It was a very long list.

Q    Okay.  And so you mentioned this extensive process.

You had to -- did you have to exhaust all other investigative techniques before you were able to get this very invasive technique of listening in on people's phone calls?

A    Yes, ma'am.

Q    Okay.  All right.  And so you mentioned that you first were listening in on the phone calls for a Sammy Saldivar; is that right?

A    Yes, ma'am.

Q    Okay.  And then Sammy led you to an individual you mentioned by the name of Jossymar Mar-Zuniga.

Tell us specifically about that date in 2021; what happened on that date?

A     On the date of the 6-kilogram cocaine?

Q     Yes, sir.

A     So we intercepted telephone calls.  When I say, "We intercepted," it's the contractors with DEA that actually listen to the phone calls live and then they contact me immediately to give me a synopsis of what that phone call was about.  So we intercepted several phone calls with Jossymar Mar-Zuniga -- I'll just refer to him as "Mr. Zuniga" -- and his source of supply in Mexico, who we identified as Marlon Alvarez -- or Marlon Garza -- I'm sorry, Marlon Garza.  During the intercepted calls, Marlon Garza had instructed Mr. Zuniga to supply 6 kilograms of cocaine at a residence off Kenilwood in Houston, Texas.  Mr. Zuniga, as he always did on most of the drug transactions that we intercepted, he had a worker of his, which we identified as Martin Eduardo Hernandez.  He instructed his worker to deliver 6 kilograms of cocaine to the residence off Kenilwood.  We initiated surveillance at that residence on Kenilwood to intercept and observe the transaction.  While we were there, we identified several vehicles that were already parked at that location.  One of those vehicles we later identified as belonging to Mr. Delacruz.  Shortly after we initiated surveillance, we observed Mr. Hernandez show up.  We had intercepted communications between Mr. Zuniga and Mr. Hernandez

confirming that he arrived, confirming he was at the right house.  He even described the house and described the people that were there just to make sure he was at the right place. We observed Mr. Hernandez exit his vehicle with a white -- black bag, carry it into the residence.  For a short while, we continued surveillance and we received a -- or intercepted several more telephone calls between Mr. Hernandez and Mr. Zuniga.  Mr. Hernandez stated that they were counting the money.  In the phone calls, you could hear the money counter being ran.  Mr. Hernandez explained to Mr. Zuniga that only five of the kilograms of cocaine had tested positive.  He specifically said that they tested it in water, which I know was code for when they test the cocaine by converting a small portion of it into crack cocaine to see if it comes out with a high purity or not. Due to only 5 kilograms of cocaine being -- testing of good quality, Mr. Hernandez informed Mr. Zuniga over the phone that they were only going to purchase five and that he was counting the money, which was 125,000.  After the transaction, he --

Q    All right.  I'm going to stop you right there, sorry.

A    Okay.  That's all right.

Q    We're going to -- let's try to break it up a little bit.

A    Okay.

Q    So you get to the point where you're --

          THE COURT:  Can you explain to me who Mr. Hernandez is?

          THE WITNESS:  Martin Eduardo Hernandez.

          THE COURT:  Okay.

          MS. LU:  And I'll clarify that.

          THE COURT:  All right.

BY MS. LU:

Q    Was Mr. Hernandez also a charged defendant in this case?

A    Yes, ma'am.

Q    Okay.  All right.

          MS. LU:  Was that okay, Your Honor?  May I proceed?

          THE COURT:  Yes.

          MS. LU:  All right.  Okay.

BY MS. LU:

Q    So what we have in the narrative so far is that they've gone inside the house after Mr. Delacruz was seen also going into the house; is that correct?

A    We didn't see him going inside the house before --

Q    Okay.

A    -- we got there, but his vehicle was parked there.

Q    Okay.  Well, you mentioned, I think, Mr. Delacruz had a white bag?

A      Mr. Hernandez.

Q      Oh, Mr. Hernandez.

A      Mr. Hernandez showed up in a white Ford Explorer, removed a black bag and carried it inside of the house.

Q      Got it.  So by the time agents and officers had arrived, Mr. Delacruz, the Defendant, was actually -- or you believed was already inside of the home.

A      Yes, ma'am, based on his vehicle being parked there and then what we saw later on.

Q      Got it.  And then from inside -- or after you saw Martin Hernandez go inside of the home, is that when you started intercepting those phone calls that you had just described?

A      Yes, ma'am, counting the money, testing the cocaine, agreeing to only purchase five of the kilograms.

Q      Okay.  And then at any point, did any of the people inside of the house come out of the house?

A      Yes, ma'am.

Q      Okay.  When did that happen?

A      I don't remember what time, but it was within an hour of when Mr. Hernandez had arrived.

Q      Okay.  Well, let's go through those one by one.

        Who came out of the house first?

A      The first person we saw and after Mr. Hernandez arrived come out was two individuals, which we later identified as

Patrick Benson (phonetic) and Willy Kaiser (phonetic).  They exited the house and got into a Nissan Juke and departed from there.  We maintained surveillance on both the Nissan Juke and at the residence on Kenilwood.

Q    All right.  And ultimately were the people inside the Nissan Juke stopped and was that Juke searched?

A    Yes, ma'am.  We requested for Houston PD officers to conduct a traffic stop on the Nissan Juke.  We knew that a 6-kilogram cocaine transaction had just taken place, which 5 kilograms were purchased, so we requested HPD to conduct a traffic stop.  They did identify the occupants as Patrick Benson and Willy Kaiser.

Q    And did they find anything when they searched the vehicle?

A    No, ma'am.  They did a quick search of the vehicle.  I would -- I couldn't put a time on it, but not extensive, less than 10 minutes, didn't find anything so we continued watching Kenilwood to see if anyone else would leave.

Q    And at that point, did HPD officers go ahead and let the two gentlemen in the Juke go?

A    Yes, ma'am.

Q    Okay.  All right.  And so the agents continued watching the house.

Who else, if anyone, came out of the house?

A    After that, we observed Mr. Hernandez, which is

Mr. Zuniga's worker right-hand man, come out of the residence with an unknown male, which we have not identified at this time. Mr. Hernandez had a bag in his possession, which he had opened up the back door, back passenger door of the Ford Explorer, placed the bag in the backseat. He then took a picture and sent a picture message to Mr. Zuniga, which we also intercepted the picture message. In the picture, was a photograph of a very large bundle believed to be 125,000 in US currency with the background being the backseat of that Ford Explorer.

Q   Okay. And so that picture was actually intercepted coming to Mr. Mar-Zuniga's phone?

A   Yes, ma'am.

Q   All right. And based on your knowledge and experience, is $125,000 the market price for 5 kilograms?

A   Yes, ma'am. At the time, the market price for a kilogram of cocaine was 25,000 per kilogram so it was exactly what the market price was.

Q   Okay. And then after that, you mentioned Mr. Hernandez, Mr. Zuniga's worker, had come out and there were these pictures taken of this money.

        Did anybody else come out of that house?

A   Yes, ma'am, Mr. Delacruz.

Q   Okay. What, if anything, did Mr. Delacruz do when he got out of the house?

A    Mr. Delacruz entered into a white Rolls-Royce, departed from the house.  Just like with the previous traffic stop, we maintained surveillance on him.  We requested for Houston PD officers to conduct a traffic stop, based on the 6-kilogram cocaine transaction that occurred at that residence, and they conducted a traffic stop on the Rolls-Royce that was driven by Mr. Delacruz.

Q    Okay.  And did they -- were they successful in stopping Mr. Delacruz?

A    Yes, ma'am.

Q    Okay.  And what happened after the stop?

A    They stopped him.  I believe they got consent.  I know they did a search.  They didn't find anything.  One of our investigators responded to the scene.  He interviewed Mr. Delacruz, informed him about the events, that we knew that there was a drug transaction that just took place at that residence and Mr. Delacruz admitted that he had provided the cocaine, the 5 kilograms of cocaine, to two individuals that were driving the Nissan Juke.  The investigator showed a photograph of Patrick Benson and Willy Kaiser to Mr. Delacruz and he positively identified them as the two individuals that were driving the Nissan Juke that received the cocaine.

Q    Okay.  And did he provide the amount of cocaine that these two individuals had purchased?

A    Yes, ma'am, 5 kilograms, which was exactly what was said on the wiretap.

Q    Okay.  All right.  And did he provide any other information about where these two individuals in the Juke were headed?

A    He also stated they were heading to Katy, Texas, but he didn't know the address.  And on the wiretap, they also stated that the cocaine was heading to Katy, Texas.

Q    Okay.  And when you say, "They also stated on the wiretap," who are you referring to?

A    Mr. Hernandez and Mr. Zuniga.

Q    Okay.  They also discussed --

A    That's right.

Q    -- that the buyers of that 5 kilograms of cocaine was -- they were going to Katy?

A    Yes, ma'am.

Q    All right.  I want to talk a little bit about what, if anything, was said on the wiretap between Mr. Hernandez to Mr. Mar-Zuniga, if there was anything, because you mentioned previously that Mr. Hernandez, while he was working for Mr. Zuniga, called him to confirm that the house was right.

Did he say anything that described the house that he was going into?

A    Described the people that were outside that it was a lot of people.  They were almost like they were having a

block party.  And he described several guys inside and outside the house were, in his words, "armed gunmen."

Q   Okay.  And so he described gunmen outside and inside of the home.

A   Yes.

Q   He described the person to Mr. Zuniga that he was actually dealing -- providing these drugs to.

A   Yes, ma'am, he actually described him in very detail. He describes his physical appearance, his height, his weight, everything from his hair cut to the actual splotches on his face.  He described what he was wearing.  He described that he was wearing an ankle monitor and he also described the vehicle that he was driving.

Q   Okay.  And so for the Record, if you could explicitly state what you remember Mr. Hernandez saying about the person that they were giving these drugs to, what did he say about what Mr. Delacruz -- sorry -- the person who was getting the drugs, what was that person wearing?

A   Obviously not verbatim from the wiretap, but from what I recall, he described him as short, dark -- very dark complected, a Cuh haircut, that he had -- it's a terminology that -- C-U-H haircut.  It's for Hispanics from the Valley that dress a certain way.  Those were his exact words, that he was -- he had some markings on his face that one of the friends that Mr. Zuniga and Mr. Hernandez knew he kind of

described him as that and he said, "You know, so and so that has the spots on his face, this guy has," which they refer to him as Primito, has spots on his face.  Described him as having jewelry on, expensive jewelry.  Described him as wearing an ankle monitor on his ankle and stated he was driving a Bentley, which was in fact a Rolls-Royce, but can obviously be confused as a Rolls-Royce because of the high end of the quality of that vehicle.

Q    Okay.  And ultimately when Mr. Delacruz was stopped after he exited out of the house, did he match all of those physical (indiscernible)?

A    Yes, ma'am, identical to facial appearance, the height, the weight, the ankle monitor that was on his ankle to the vehicle he was driving.

Q    Okay.  And did Mr. Delacruz -- you mentioned that he was stopped, that he spoke to some agents.  Did he, in fact, admit that he was the one who brokered this drug transaction?

A    Yes, ma'am, he did.

Q    Okay.  Let me ask you this, Officer Emmerson: did DEA ever sanction this purchase of drugs by Mr. Delacruz?

A    No, ma'am.

Q    Did DEA every sanction this brokerage of a drug deal by Mr. Delacruz?

A    No, ma'am.

Q    To your knowledge, did any law enforcement agency sanction this brokerage of this drug deal by Mr. Delacruz?

A    No, ma'am.  We have a system -- a deconfliction system whenever you're at a residence where you can make sure you're not going to encounter any other law enforcement and in this case we used that method.  We contacted the Operation Center to make sure that no other law enforcement agency was working in that area or at that house and there was no deconfliction.

Q    Okay.  So you had deconflicted for the house.  Did you ultimately find out what Mr. Delacruz's phone number was?

A    Yes, ma'am.

Q    Did he actually tell you that?

A    Yes, ma'am.  He provided it to the investigator in hopes of talking later on.

Q    Okay.  And after -- were you able to run that phone number in your deconfliction database?

A    Yes, ma'am, I did and no deconflictions.

Q    Okay.  And so there was no conflict with any other law enforcement agency, based on your research into the phone number.

A    Correct, yes, ma'am.

        MS. LU:  Your Honor, at this point, I pass the witness.

        THE COURT:  All right.  Mr. Mayr?

MR. MAYR:  You went really fast and I'm going to need to slow it down to understand everyone who's --

THE WITNESS:  Okay.

MR. MAYR:  -- involved to make sure that I've got a clear understanding so that hopefully the Court has a clear understanding of everyone involved.

THE WITNESS:  Yes, sir.

CROSS-EXAMINATION OF JAMES EMMERSON

BY MR. MAYR:

Q    Mr. Zuniga, what is his full name?

A    Jossymar Alfonso Mar-Zuniga.

Q    Jossymar Alfonso?

A    Yes, sir.  Mar, M-A-R, hyphen, Zuniga.

Q    Zuniga.  Do you have your DEA-6 with you?

A    No, sir.

Q    You reviewed it prior to testifying?

A    Yes, sir.

Q    There's several references to an Alonso; who is that?

A    That's Jossymar Mar-Zuniga.

Q    Okay.  Thank you.  Sammy Saldivar is who is tapped.

Do you know was -- your DEA-6 makes reference to UM2999; do you know who that's referring to?

A    Martin Eduardo Hernandez.

Q    Marlon Garza is the source of supply in Mexico, correct?

A     Yes, sir.

Q     You have Title III wiretaps of a call between Marlon Garza and Jossymar Mar-Zuniga also referred to as Alonso, correct?

A     Yes, sir.

Q     In that initial conversation between Garza and Zuniga, is there any reference to Raul Delacruz?

A     By name?  No.

Q     Is there any reference by physical description between those two individuals?

A     I'd have to review the line sheets and the wiretaps that -- I don't know if there was an actual description of -- in between Mr. Garza and Mr. Zuniga.

Q     In all of these conversations and transactions, a lot of these guys have nicknames, right?

A     Correct.

Q     Primo and Burro and things like that.

A     Yes, sir.

Q     Okay.  Who's Burro?

A     That's Jossymar Mar-Zuniga.

Q     Okay.  So Jossymar Mar-Zuniga is also Alonso and is also Burro.

A     Yes, sir.

Q     B-U-R-R-O.

A     Yes, sir.

Q    Who's Primo?

A    That's who we believe is Mr. Delacruz.

Q    Okay.

A    Also known as Primito.

THE COURT:  Known as what?

THE WITNESS:  Primito.

THE COURT:  How do you spell that?

THE WITNESS:  P-R-I-M-I-T-O.

THE COURT:  Okay.

BY MR. MAYR:

Q    Why is it that you believe that that is his nickname?

A    On the wiretap, they described him to the T.  It's like I said, the splotches on his face, his height, his weight, what he was wearing, the ankle monitor that was on his ankle, all that they referred to as Primito.

Q    In this initial call be Marlon Garza and Mr. Zuniga, is there ever a reference to Primo or Primito?

A    I don't remember.  I'd have to review.

Q    Marlon instructs Zuniga to supply the drugs at Kenilwood; is that correct?

A    Yes, sir.

Q    Martin Hernandez, what other AKAs is he known by?

A    I'd have to review.  There's a lot of defendants in the case and a lot of nicknames.  I know specifically in the DEA-6 that you're referencing to, it was UM2999.

Q    2999.  Okay.  I just need to make sure there's no other -- anything he may be referred to as in other documents.

A    Yes, sir.

Q    So there's a conversation between Martin Hernandez and Zuniga.

Zuniga is giving him instructions to deliver the cash or the drugs to the house?

A    The drugs, 6 kilograms of cocaine.

Q    Okay.  Surveillance shows Hernandez arrive with the bag of drugs pretty much, right?

A    Yes, sir.

Q    And pretty -- not much doubt that that bag has all the cocaine and he's the one showing up there, right?

A    At the time -- of course there is always doubt, but after the transaction, the photographs that were intercepted, the conversations, then it was obviously no doubt that bag was drugs.  But at the time, no, I can't say I was 100 percent certain.

Q    In hindsight.  I get that.

Do you have any record of any conversations -- let me ask you this: in the conversations between Martin and Zuniga, do they reference Primo or Primito?

A    Yes, sir.

Q    Okay.  The vehicle that you determined belonged to

Mr. Delacruz was a Rolls-Royce Ghost; is that right?  I can't remember exactly.

A     Yes, sir, it was a Rolls-Royce Ghost, white.

Q     Did you run the registration on that vehicle?

A     I'm sure my intel -- one of our intel analysts ran the registration.

Q     Is it your sworn testimony that that vehicle is -- that he is the registered owner of that vehicle?

A     I never said that.

Q     Okay.  Well, you said it "belongs" to him.

A     As far as I understand, if someone's driving that vehicle and their in sole possession of that vehicle, it belongs to them at that moment.  But as far as registered with the Department of Motor Vehicles, no, I did not say that and I do not --

Q     Okay.

A     -- know if it was registered.

Q     And I'm not going to mince words with you, but I want -- so that we're all on the same page and we understand this, that when you say, "Belonged to him," is that synonymous with you believe that he's associated with that vehicle?

A     Yes, sir.  He was driving it.

Q     Did you all notice if anyone else was in the vehicle at any time as you all are conducting your surveillance?

A     No, sir, not that I recall, no.

Q     Okay.  Never noticed a Black female seated in the car or either driving or as a passenger in the vehicle?

A     I'd have to refer to my report or refer to the other (indiscernible) surveillance.  I can't remember if anyone else was seated in the car with him or in the car at all.

Q     Let's talk about the house at Kenilwood.

Any investigation into that house at Kenilwood in terms of who the owner was, who resided there?

A     Yes, sir, I'm sure there was some kind of investigation with our intelligence analyst to do a follow up on.

Q     Can you tell the Court anything about that?

A     I'd have to refer to a report, I don't recall.  Nothing substantial came out of it I know that.

Q     You said that there was a -- that there were a large number of people out there in front of the house; is that correct?

A     Yes, sir.  That's what was stated on the wiretap and what we observed.

Q     Can you describe these people and what they were doing?

A     No.  I wasn't the one that had physical eyes on the house.  Like I said, while I'm handling the phone calls, I have other investigators handling the surveillance and watching the house.  They would be the ones to best describe what was happening.

Q    Who's watching that, who are those agents?

A    I'd have to refer to my report.

Q    Help me --

        MR. MAYR:  May I approach, Your Honor?

        THE WITNESS:  At the very bottom.

        MR. MAYR:  You can find it probably a lot faster.
I just got it an hour --

        THE WITNESS:  Yeah.  Special Agent Jacob Hodges,
TFO Mike Phillips and TFO Rick Valdivia (phonetic).

        MR. MAYR:  I was provided with a video of
Mr. Hernandez at the Expedition right when he was getting
out and --

        THE WITNESS:  Yes, sir, I remember.

        MR. MAYR:  -- checking the drugs and everything.

BY MR. MAYR:

Q    Is that the only video that was made of what was taking
place out there that day or were there other videos?

A    No, sir, that's the only video that I'm aware of.

Q    Is it possible that there were other videos made of
what took place that day?

A    If there is Ring cameras and if anyone has securities
cameras, there's always a possibility but.

Q    At least with law enforcement.

A    No.  They would have provided it to me.

        THE COURT:  What is the date of this event with

the 6 kilograms?

THE WITNESS:  July 15th, I believe, 2021.

MR. MAYR:  Okay. You were asked by Ms. Lu about people that -- after Mr. Hernandez arrived, Ms. Lu asked you about some of the people that left.  There's a lot of people that are congregated.

BY MR. MAYR:

Q    Are people coming and going or is it just -- or is Willy -- is Patrick Benson and Willy Kaiser the first people to leave that house?

A    Those are the first people to leave that house.  I mean, obviously when -- I don't know if you want me to go on, but obviously our intention was to try to find the 6 kilograms of cocaine and stop and seize it so any vehicle that left we were trying to follow it.

Q    Okay.  Patrick Benson and Willy Kaiser, are they co-defendants in this case?

A    No, sir.

Q    Do you have any reason to suspect that they're involved -- that either of them are involved in illegal narcotics activities?

A    Yes, sir, I do suspect it.

Q    Okay.  What are you -- well, I'm not going to get into that.  They're pulled over, the car is searched and nothing is found inside the car.

A     Yes, sir, correct.

Q     And there's no contraband found whatsoever.

A     No, sir, none.

Q     Do you know, were they asked what they were doing at the house?

A     I'm sure they were asked by one of the investigators on the scene, but I don't remember.

Q     Okay.  We don't know what they told them.

A     Correct.

Q     All right.  The next people to come out of the house is Mr. Martin Hernandez with another male; is that right?

A     Yes, sir.

Q     Who was this other male?

A     It's just -- in the report, the DEA-6, I believe he's referring to as UM3564.  It's an unknown male, which we haven't identified yet at this time.

Q     Can you -- do you know what -- can you tell the Court what his description was, what he looked like?

A     No.  They didn't describe him on the wiretap at all like they did in detail with Mr. Delacruz.

Q     Presumably either Special Agent Hodges, Phillips or Valdez [sic], they would have seen them and know what this person looks like, right?

A     Valdivia.

Q     Valdivia.

A    Yes.

Q    They would have seen this other individual leaving with Mr. Hernandez, right?

A    He didn't leave with him, but to step outside with him, yes.

Q    Okay.  They would know what this individual looked like.

A    I can't say what they would know or wouldn't know, but they were on surveillance.

Q    Well, someone saw Mr. Hernandez step out with this other male, correct?

A    Yes, sir.

Q    It wasn't you.

A    Correct.

Q    It was some other agents who saw him.

A    Yes, sir.

Q    Okay.  So they would be able to describe what this male looked like.

A    Yes, sir.  I just can't promise what someone -- another agent or another investigator what they can -- what they did and did not see.

Q    Okay.

A    That would be something they would have to tell you.

Q    Mr. Hernandez, who has presumably or almost certain shown up with the cocaine, is now stepping outside and has

the cash that he has received for the cocaine.

A    For partial, for 5 kilograms, not the 6 kilograms.

Q    For 5 kilograms, right.  And we -- they took pictures and you intercepted those pictures so again there's no question that he's got the money.

A    Yes, sir.

Q    All right.  And that 125,000 is the market price of 5 kilos so that's consistent with what he has purchased or what he has sold, right?

A    Correct, yes, sir.

Q    He is the supplier.  Someone showed up with the money, purchased it.  Okay.  Now Mr. Delacruz leaves.  He doesn't have the cocaine.

There's no contraband found in his vehicle, right?

A    Correct.

Q    Do you recall if anyone else was in the vehicle with him at the time he was stopped?

A    I think so.  I just don't recall though.

Q    So no contraband in the car.

Where's the cocaine?

A    What we believe happened is the cocaine was concealed in a hidden compartment in the Nissan Juke.

Q    Okay.  Which would explain -- so going back to that traffic stop that was initially made by another officer, it was searched but you believe it wasn't searched well enough.

A    Not to the extent to look for an actual aftermarket hidden compartment inside of a vehicle.

Q    Okay.  These little -- these Jukes, these aren't big cars.  These are small subcompact SUVs, right?

A    Yes, sir.

Q    But that's pretty much speculation on your part that that's where the drugs went, right?

A    Sort of speculation.  We did find the compartment in the vehicle later on and did seize drugs and a lot of money.

Q    All right.  And this is the Juke that was occupied by Mr. Benson and Mr. Kaiser?

A    Yes, sir.

Q    Were they in that car when it was seized?

A    No, sir.

Q    Okay.

A    It was a different driver.

Q    Okay.  Was there anyone else that you all observed leave that house?

A    I'd have to refer to my report.  A lot of activity was going on.

        MR. MAYR:  May I approach?  I have that --

        THE COURT:  Yes.

    (Pause in the proceedings.)

        THE COURT:  I've forgotten the question that you're asking him to look for in his report.

MR. MAYR:  It was any reference to any other --
having seen anyone else leaving the house.

THE WITNESS:  No, sir.

MR. MAYR:  Okay.

THE WITNESS:  I'm sorry, it's a 10-page report so
it took a second, but Martin Hernandez was the only one that
eventually left the house.

MR. MAYR:  Martin Hernandez.

THE WITNESS:  Yes, sir, with the money.

BY MR. MAYR:

Q    Did anyone -- this was after he had taken the pictures
and sent them off.

A    Yes, sir.

Q    The other male that was with him, what happened to him?

A    I believe he went back inside the house.  I don't
recall exactly what he did.  At that time, the surveillance
had split up following Martin Hernandez, following
Mr. Delacruz and I don't think we had enough people to stay
behind as a third team just stay account with.

Q    So the house was left behind without any surveillance
and obviously with people there, right?

A    Yes, sir.

Q    All right.  The traffic stop was made by just some
patrol -- by patrol officers in a marked vehicle; is that
right?

A    Yes, sir.

Q    And then eventually they held Mr. Delacruz there until another investigator, Detective Alfredo Garza, could come; is that right?

A    Yes, sir.

Q    Do you know whether those -- do you know if those officers were wearing body worn cameras?

A    No, sir, I don't.

Q    Do you know if they -- the question is: do you know if they were or not?

A    I said, "No, sir, I don't."

Q    Okay.

A    The officers -- as far as the investigators, none of us were body worn cameras.

Q    Okay.  And so this interview that takes place between Detective Garza and Mr. Delacruz isn't being recorded at all.

A    No, sir.  We don't wear any recording devices or anything like that for protection.

Q    The patrol officers, were they still there on the scene?

A    Yes, sir.

Q    What's relayed to you by Detective Garza -- where is Detective Garza right now?

A    I can't tell you.  Somewhere in Houston.

Q    Is he still employed by -- with law enforcement?

A    Yes, sir, he's still with Houston Police Department.

Q    Okay.  Have you had any conversations or contact with him prior to testifying today within like the last day or two, have you had any contact with him?

A    Yes, sir.

Q    Okay.  So he knows that you're down here testifying about this conversation, right?

A    Yes, sir.

Q    Okay.  But he's not here to testify to that conversation.

A    No, sir.

Q    All right.  Mr. Delacruz, according to what's in your report, admitted that he was on bond for federal charges, correct?

A    Yes, sir.

Q    The full extent of the conversation and what was said by the detective and what was responded to by Mr. Delacruz you don't know exactly what was said and exactly what he responded to, right?

A    Correct.  I just know what was reported to me -- what's in the report.

Q    Was he read his Miranda warnings prior to any --

A    I don't know, sir.

Q    Okay.

MR. MAYR:  Well, I don't think I have any further questions for this witness, Your Honor.

THE COURT:  All right.  Ms. Lu, do you have anything else?

MS. LU:  Yes, Your Honor, just some clarification.

Officer Emmerson, there's been a lot of talk about who Mr. Delacruz is, is he Primito, what was going on.

REDIRECT EXAMINATION OF JAMES EMMERSON

BY MS. LU:

Q    Was there anybody else who matched the physical description given by Martin Hernandez at that house, at that location?

A    No.  No, ma'am, especially when it was to the T and ankle monitor and everything.

Q    Okay.  Was there anybody else who could be mistaken, kind of looked like Mr. Delacruz at that location?

MR. MAYR:  I'm going to object.  Lack of personal knowledge.  He's testified that, one, he wasn't there.  Two, that there were other people there that he -- they didn't really know who was there or not, so I would object to lack of personal knowledge.

THE COURT:  Well, the Rules of Evidence are relaxed in these detention hearings.

MR. MAYR:  I know.

THE COURT:  I'll let her ask the questions.

You're free to recross on the --

MR. MAYR:  Okay.

THE COURT:  -- lack of foundation as you see it.

THE WITNESS:  My personal knowledge is, I mean, primarily relies on the wiretap so I'm the one that actually receives the calls and I received the description of the person that they referred to as Primito.  As far as the physically seeing who was there at the house, I'm relying on the other investigators that were there.  But to my knowledge to answer your question, no.

MS. LU:  Okay.

BY MS. LU:

Q    And, in fact, did the investigators indicate in the report that there was an unidentified other Hispanic male who was accompanying Mr. Delacruz?

A    Correct, UM3564.

Q    Okay.  All right.  And was that the guy who actually put the money into the car that Mr. Hernandez was driving?

A    He was with Mr. Hernandez as they were -- as Mr. Hernandez put the money into the car, yes, ma'am.

Q    Okay.  And finally I'd like to get to what Mr. Delacruz himself said to Detective Garza.

Did he himself admit and describe the person who brought him that cocaine?

A    Yes.  He was shown a -- he described Mr. Hernandez, he

described what Mr. Hernandez was driving, which was a white Ford Explorer.

Q    And did he also both describe and ultimately identify the people who bought the cocaine after he was given the cocaine from Mr. Hernandez?

A    Yes, ma'am.  He described the two individuals, which were Black males, that were driving a Nissan Juke.  He was shown a photograph of both of those two males, which we had identified on the previous traffic stop, Patrick Benson and Willy Kaiser, and he positively identified the photographs as those two individuals.

Q    Based on your review of all the reports generated in this case, discussion with other officers on scene, review of video taken at the scene and pictures taken at the scene, was there anybody else on scene wearing an ankle monitor?

A    No, not that I'm aware of, no.

Q    Okay.  And finally you mentioned that there was an aftermarket compartment later discovered in the Nissan Juke, which you had indicated to the Court explains why HPD wasn't -- they weren't able to find the 5 kilograms of cocaine.

How do you know that there was an aftermarket compartment in that Nissan Juke?

A    We put a -- after we learned that that vehicle from -- off the wiretap and from Mr. Delacruz's interview, we

believed that the officers missed the cocaine because it did have a compartment. So we put a look-out on the license plate. We eventually got alert a few months later. We had officers conduct a traffic stop as that vehicle was coming back westbound into the State of Texas. I believe it was Baytown PD officers that conducted the traffic stop. They did locate an aftermarket compartment. It was built into the passenger airbag compartment. And 180,020 of US currency was seized and just under a kilogram of cocaine was seized inside that compartment.

Q    That was found inside the hidden compartment.

A    Yes, ma'am. The same Nissan Juke that was at the house on Kenilwood.

Q    Right. What investigative tools or resources did you have to use to even locate that aftermarket compartment?

A    There are different cameras that are positioned throughout the roadways that they pick up the license plates of vehicles that pass through. When we put a look-out on a vehicle, we get an alert whenever that license plate that we're looking for and the location of where that vehicle was picked up at. And in this case, it was picked up coming from Louisiana coming back to Texas.

Q    Right. What I mean is: did you have to use like an x-ray machine to find that aftermarket compartment?

A    I personally? No. The Baytown PD officers or the

officers that conducted the traffic stop, I'm not sure if they did.  I believe they had to.  They did have the -- we did learn there was likely a hidden compartment so I know they spent more effort searching at this time as opposed to the first time of traffic stop.

Q    Okay.  And it was only after agents had an opportunity to interview with Mr. Delacruz that they were able to even look at the Nissan Juke to look for an aftermarket hidden compartment.

A    Yes, ma'am.  Obviously would probably not have looked as hard as we did if it wasn't for the interview of Mr. Delacruz.

Q    Okay.  All right.

        MS. LU:  Your Honor, that's it.  I pass the witness.

        THE COURT:  All right.

        RECROSS-EXAMINATION OF JAMES EMMERSON

BY MR. MAYR:

Q    Agent, you don't have a 100 percent certain accounting of everyone who was going into that house and leaving that house for that entire 24-hour period, right?

A    Correct, yes, sir.

Q    You're there -- agents are there for a short period of time watching some of the people coming and some of the people going, right?

A    Yes, sir.

Q    All right.  And as you testified previously, after the Juke leaves, after the Rolls that Mr. Delacruz then leaves, no one is there watching the house to see who was continuing to come and go, right?

A    After Mr. Hernandez and after Mr. Delacruz left, yes, I don't think we had enough manpower to stay behind and watch the house.

MR. MAYR:  If I may have a moment, Your Honor?

THE COURT:  You may.

(Pause in the proceedings.)

BY MR. MAYR:

Q    The wiretaps that you testified to here are a small, very small fraction of the wiretaps that are involved in the entire investigation of this case; is that right?

A    Yes, sir.

Q    There are several defendants, coconspirators that you all have charged and that you have gathered evidence to charge other individuals with; is that right?

A    Yes, sir.

Q    Do you -- in all of the other -- this entire investigation related to this entire Indictment, have there been any other recordings or any other information provided to you or anyone associated with this investigation related to Primo or Primito?

A    Yes, sir.

Q    Has there been any other evidence to show that Mr. Delacruz is involved in any of these other transactions or anything else related to the allegations in this Indictment?

A    In my belief, yes, sir.

Q    But on this day, this is the only time anyone in law enforcement has any face-based personal contact with Mr. Delacruz; is that correct?

A    No, sir.

Q    In the course of this investigation, what other contact had law enforcement had with Mr. Delacruz?

A    Mr. Delacruz met with investigators to cooperate.

Q    No, no.  I'm talking about -- okay.  In regards to this -- in regards to the allegations in this particular Indictment.

A    No, sir.

MR. MAYR:  All right.  I have no further questions.

MS. LU:  No further Redirect, Your Honor.  I ask that this witness can be excused.

THE COURT:  All right.  You may be excused, sir.

THE WITNESS:  Thank you, ma'am.

THE COURT:  Uh-huh.

(Witness excused.)

THE COURT:  Ms. Lu, do you have any other witnesses?

MS. LU:  Your Honor, we have no further witnesses.

We ask just to offer the Pretrial Report into evidence.

THE COURT:  All right.  I will take judicial notice of the information in the Pretrial Report.  I'll enter it into evidence as a sealed exhibit.

Any objection?

MR. MAYR:  None.

THE COURT:  All right.

(Pretrial report sealed and admitted into evidence.)

THE COURT:  Okay.  What else, Ms. Lu?

MS. LU:  With that, the Government rests.

THE COURT:  All right.  Mr. Mayr, do you have any witnesses?

MR. MAYR:  Not at this time, Your Honor.  Before I proceed, yesterday at our initial, you entered the *Brady* Order.  I'm going to make a formal request on the Record that the Government provide me with any exculpatory evidence under *Brady* and specifically what I'm interested on, before we take any steps further, is obtaining the body camera recordings that the officers who initially stopped -- that initially made the traffic stop of Mr. Delacruz.

Just as sort of kind of an opening statement, we

very strongly dispute the representations that have been made by the non-testifying witness.

THE COURT:  About the statements Mr. Delacruz made to Officer --

MR. MAYR:  Yes.

THE COURT:  What was the officer's name?

MS. LU:  Garza.

MR. MAYR:  Officer Garza.

THE COURT:  But I thought -- all right.

MR. MAYR:  Officer Garza did not record the statements and so --

THE COURT:  Understood.

MR. MAYR:  -- the next best thing that I can try to look at to prove the lack of veracity of Detective Garza's account of what was said is to try to get those body cams.  I need to have those before I offer or proffer further testimony.  And then again what I would ask is -- I ask to continue the hearing and allow me to submit by written proffer what the evidence would be after I've had an opportunity to review those body cams, if they do exist.

THE COURT:  All right.  Barring an agreement, is there an agreement to produce that, this --

MS. LU:  Your Honor, I will send out an email this afternoon asking for body cams, if any exist for that afternoon.

THE COURT:  Okay.  Just for the Record, in the context of this hearing, I'm not sure you're entitled to that evidence.  If Ms. Lu doesn't object to producing it, I will grant your continuance and give her the opportunity to see if it exists, if she's going to produce it to you, give you the opportunity to review it and then either we can come back here or if it's possible to submit a written proffer and Ms. Lu has no objection to you submitting a written proffer, then we can do that.  I'm just not making any ruling right now at this hearing that this is material you're entitled to for the purposes of a detention hearing.

MR. MAYR:  Understood.

THE COURT:  All right.

MR. MAYR:  In addition to that, there's a number of other -- there's other information beyond that that I need to submit by written proffer so if the Government is not opposed, I imagine it's going to take -- it's going to take a little bit of time to try to find and produce those body cams.  I would be fine -- we will -- for the Record, we will waive any of the time limits set forth under the Bail Reform Act for the detention hearing.

Do you want anything affirmative from my client regarding that on the Record or?

THE COURT:  I do.  Mr. Delacruz, can I have you stand?  Your client has -- your attorney has just said

that -- he's asking for a continuance of this hearing.  As I told you when you appeared before me yesterday, you're entitled to this hearing within three days of the date that you appear before me.  You're entitled to request a continuance of up to five days.  We've begun this hearing, but I think what your attorney is telling me is that he needs more time to get other evidence that he wants to produce as a written proffer.  He wants time to get body camera footage from the, I believe, Baytown police officers.

MR. MAYR:  Houston.

THE COURT:  Houston.

MS. LU:  Oh, it should be HPD, Your Honor.

THE COURT:  Houston police officers.

Are you -- because you're entitled to have this hearing by statute within three days, are you agreeing to waive those time limits so that when this is continued beyond the three days to which you're entitled, are you agreeing to waive those time periods?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  You may be seated, sir.

MR. MAYR:  Do you want to set something later next week?  And then we can just provide some status to your case manager and then we can figure out scheduling --

THE COURT:  Okay.

MR. MAYR:  -- later on down the road.

THE COURT:  Okay.

MR. MAYR:  I'm okay with that if you're okay with that.

THE COURT:  Yes.  I need to look at -- I need to have Ms. Morgan pull up my Calendar.  I know I have several civil hearings on Monday.  I don't know what Tuesday looks like.  It sounds like you might need more time than Monday.

MR. MAYR:  Yes.

THE COURT:  Maybe I can pull it up too.

(Pause/Court confers with the clerk.)

THE COURT:  I could set you for -- we can move that 2:00 o'clock phone conference.

THE CLERK:  Okay.

THE COURT:  I can set you for Tuesday afternoon or Wednesday morning.

MR. MAYR:  I believe -- let me just make sure.  I looks like either of those are going to work pretty well for me.

THE COURT:  Okay.  Why don't we -- I can be a little bit flexible.  I've got a 2:00 p.m. telephone conference that should be able to be moved around so --

MR. MAYR:  Actually I have -- Tuesday afternoon I'm out from 2:00 to 4:00.  I'm sorry, I'm reading my calendar.

THE COURT:  Okay.  So Wednesday morning?

MR. MAYR:  Wednesday morning.

MS. LU:  Yes, Your Honor.  I only have a quick grand jury presentation at 9:30, but I think I -- we should be available by 10:00, if that's all right with the Court.

THE COURT:  All right.  I'll be in a settlement conference starting at probably 1:00 o'clock so.

MR. MAYR:  If I don't have what I need and I haven't presented everything, I will reach out to the Court and the Government and talk about additional time or I'll file a motion asking for additional time.

THE COURT:  Either email --

MS. LU:  Yes, Your Honor.

THE COURT:  -- with all -- with a copy to all counsel to Ms. Morgan or a motion.

MR. MAYR:  Right.

THE COURT:  All right?

MR. MAYR:  Right.

MS. LU:  Thank you, Your Honor.

THE COURT:  Is there anything else we need to -- has Mr. Delacruz been arraigned?

MR. MAYR:  He has not.

THE COURT:  Would you want to do that today?

MR. MAYR:  We can knock that out.

THE COURT:  All right.  So it's only one count for Mr. Delacruz.

MR. MAYR:  That's correct, Your Honor.

MS. LU:  74, yes, Your Honor.

THE COURT:  All right.  Mr. Delacruz, you appeared before me I believe it was yesterday.

MR. MAYR:  It was yesterday.

THE COURT:  And I informed you of the charge that was brought against you in the Indictment.

I gave you a copy of the Indictment, correct, sir?

THE DEFENDANT:  Yes.

THE COURT:  All right.  You're charged in Count 74 of the Indictment with conspiracy -- whoever has a phone needs to turn it off, all the way off.  You're charged in Count 74 with conspiracy to possess with the intent to distribute cocaine.  The allegation involves 5 kilograms or more of a substance or mixture containing a detectable amount of cocaine.

And that offense is alleged to have occurred on July 15th of 2021.

The conspiracy to possess means that you're charged with knowingly conspiring or agreeing with others to possess with the intent to distribute the controlled substance or the cocaine, 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine.

And the allegation is a violation of 21, US Code, Section 846, 841(a)(1) and 841(b)(1)(A).

You're charged in Count 74 with Jossymar Alfonso Mar-Zuniga.

If you are convicted on Count 74, you face:

A minimum of 10 years in prison up to life in prison;

A fine of up to $10 million;

A term of supervised release of a minimum of five years up to life on supervised release;

And a $100 mandatory special assessment.

Do you understand the charges and the minimum and maximum penalties that you face if convicted?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Have you had time to review the Indictment, Count 74 in the Indictment and to discuss the charges with your attorney?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Are you ready to enter your formal plea to the charges in the Indictment?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And how do you plead to Count -- to the charges in Count 74, sir?

THE DEFENDANT:  Not guilty.

THE COURT:  All right.  We're going to enter a not guilty plea on your behalf.

This case is assigned to Judge Bennett.  It is

currently set for trial on May 9th, 2022 at 9:00 a.m. The motions must be filed by March 21, responses by March 31. Your proposed jury charge and voir dire questions are due by April 28th and your pretrial conference is currently scheduled to May 5th at 2:30 p.m. And the estimated number of trial is approximately one month.

And are you waiving speedy trial limits at this point?

MR. MAYR: We are -- not at this point, Your Honor.

THE COURT: All right. We will enter that on the Record. And I don't think there's anything else that we can handle today. So this hearing is continued until Wednesday morning at --

MR. MAYR: 10:00 a.m.

THE COURT: -- 10:00 a.m. All right.

Thank you, everyone. You're excused.

MS. LU: Thank you, Your Honor.

MR. MAYR: Thank you for your time, Your Honor.

THE COURT: You're welcome.

(Hearing adjourned at 4:32 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #65482*

*DATE FILED:  MARCH 16, 2022*