IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

UNITED STATES OF AMERICA      §    CASE NO. 4:22-CR-00081
                              §    HOUSTON, TEXAS
VERSUS                        §    WEDNESDAY,
                              §    APRIL 13, 2022
DERICK LEMARK JACKSON         §    10:06 A.M.

DETENTION HEARING
(VIA ZOOM)

BEFORE THE HONORABLE YVONNE Y. HO
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                              SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:    RACHEL WILLBORG

CASE MANAGER:                    SAMANTHA WARDA

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX 77478
281-277-5325
mary@judicialtranscribers.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE GOVERNMENT:          CHRISTINE JIADAI LU, ESQ.
                             U.S. Attorney's Office
                             1000 Louisiana Street
                             Suite 2300
                             Houston, TX 77002
                             713-567-9486
                             christine.lu@usdoj.gov


FOR THE DEFENDANT:           ROBERT VALLES, JR., ESQ.
                             Valles and Associates
                             3700 N. Main
                             Houston, TX 77009
                             281-971-6200
                             281-971-6201 (fax)
                             VallesandAssociates@gmail.com

ALSO PRESENT:                CALLIE DERRICK
                             U.S. Pretrial Services

<u>INDEX</u>

| WITNESS: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| JAMES EMMERSON | | | | |
| By Ms. Lu | 5 | . | . | . |
| By Mr. Valles | . | 14 | . | . |

| EXHIBITS: | <u>Marked</u> | <u>Offered</u> | <u>Received</u> |
|---|---|---|---|
| (None offered.) | | | |

***

**HOUSTON, TEXAS; WEDNESDAY, APRIL 13, 2022; 10:07 A.M.**

THE COURT:  Good morning.  The United States District Court for the Southern District of Texas is now in session.  My name is Judge Yvonne Ho.  I am calling case 4:22-cr-81-42, *United States v. Derick Lemark Jackson*.

Let me take appearances for the Government.

MS. LU:  Good morning, Your Honor.  Christine Lu for the United States.

THE COURT:  Good morning.

And then, for Mr. Jackson?

MR. VALLES:  Yes, Your Honor.  Good morning.  This is Attorney Robert Valles on behalf of Mr. Jackson.

THE COURT:  All right.  Thank you.

Before we get started, I understand, Mr. Valles, you have a question?

MR. VALLES:  No, ma'am.  Not that I can think of right now.

THE COURT:  Okay.  All right.  Maybe, I misunderstood.  Just to as a sort of recap for the Record, there was a question as to whether the Court can proceed and hold a detention hearing for Mr. Jackson, given the detention order in Alabama.

I pulled the recording of that hearing, listened to it, I looked at the minute order that was issued on the docket sheet in Alabama, and I have been in communication

with Judge Milly, who is the magistrate judge who issued the detention order, and I reviewed that Record, and Judge Milly has agreed that his detention order was limited to determination of whether Mr. Jackson should be detained pending his transfer for appearance on these charges in Texas.

And as a result, you know, we essentially don't have a detention determination as to whether Mr. Jackson should be detained or released pending trial on the charges here in Texas.

Does anybody have any questions or comments about that?

MS. LU:  No, Your Honor.  Thank you so much for that clarification.  I just had never had an experience where there was a detention hearing, like, in, you know, their arresting jurisdiction, and then also, in the charging jurisdiction.

THE COURT:  Well, I will say that my informal survey of the magistrate judges here has concluded that this is unusual; but given how the detention order was expressly limited in scope, you know, we essentially have a gap, and so Mr. Jackson is entitled to have a detention hearing right now if he chooses to request one.

So are we going to proceed with the detention hearing?

MS. LU:  Yes, Your Honor.  The United States is prepared to proceed.

THE COURT:  All right.  You may call your first witness, and Ms. Warda will swear the witness in.

MS. LU:  Yes, Your Honor.  The United States calls James Emmerson.

THE CLERK:  Okay.  Can you raise your right hand?

JAMES EMMERSON, GOVERNMENT'S WITNESS, SWORN

THE CLERK:  Thank you.

DIRECT EXAMINATION OF JAMES EMMERSON

BY MS. LU:

Q    Mr. Emmerson, would you please introduce yourself to the Court?

A    My name is James Emmerson, spelled on the screen with two M's.  I am assigned to the DEA Galveston Office.  I have been a police officer with the Galveston Police Department for about 19 years, and I have been assigned to the DEA for about 12 years.

Q    Can you describe to the Court what your duties are as a DEA TFO?

A    I just explicitly investigate crimes regarding drug trafficking and money laundering, those that are relevant to (indiscernible) trafficking, drug trafficking (indiscernible).

Q    Okay.  And is the goal of your investigations to

dismantle these larger drug trafficking organizations?

A    Yes, ma'am.

Q    Okay.  So can you tell us specifically about this investigation?  I think it's called "Operation Twisted Tea."  Just generally, could you summarize for the Court what that investigation entailed?

A    Yes, ma'am.  It initially started with information from a confidential source.  The confidential source was in communications with several of the Co-Defendants in this case, and specifically, the ones residing in Mexico and (indiscernible) Mexico.

The CS was able to introduce multiple undercover officers.  In the course of the investigation, we maybe introduced and developed over a dozen confidential sources and undercover officers, which then led us to obtaining multiple wiretaps.  I believe we obtained 15 telephone wiretaps in the case.

Ultimately, obtained an Indictment, and 65 defendants were indicted, and I believe 55 were arrested.

Q    Okay.  And now, can you describe for the Court, Officer Emmerson, what that process is to obtain a wiretap on a phone?  Is it, you know, a relatively simple process, or is it more difficult?

A    That's a lengthy process.  The probable cause needed, you know, relies simply on necessity.  You have to, you

know, (glitch in audio) so that you have gone through every avenue with traditional avenues investigative efforts such, you know, undercover officers doing undercover meetings, undercover purchases, surveillance, both physical and electronic, pull cameras -- pretty much just show you have exhausted all investigative methods within the -- that you need for a Title 3 telephone wiretap.

Q    Okay.  And now, I would like to focus, specifically, on Mr. Jackson.  During the course of this investigation, Operation Twisted Tea, where you obtained these wiretaps like you described and used all those other investigative techniques you described, did you encounter someone by the name of Derick Lemark Jackson?

A    Yes, ma'am.

Q    Okay.  Can you tell the Court how you came upon him in that investigation?

A    We had obtained a telephone wiretap on one of the Co-Defendants in this case, Jorge Gonzalez.  Jorge Gonzalez was a resident in McAllen, Texas and would travel pretty much weekly to Houston, Texas.  We intercepted him from another wiretap on another Co-Defendant, Sammy Saldivar.

Once we activated the wiretap on Mr. Gonzalez's phone, you know, we almost immediately intercepted conversations between him and Mr. Jackson in Mississippi -- or Alabama, I'm sorry.

The conversations were discussing drug transactions, both prior drug transactions in which a drug debt was owed, as well as future pending drug transactions.

Q    Okay.  And you know, after listening to these future plans for conducting drug deals, did you or other investigators actually observe Mr. Jackson engaged in one of those deals?

A    Yes, ma'am.  One of the first transactions that we intercepted, which we conducted surveillance on, Mr. Jackson and another individual, Mr. Larry (phonetic) Ford, traveled from Alabama to Houston, Texas.  Mr. Jackson had negotiated the purchase of 3 kilograms of cocaine from Mr. Gonzalez, based on the intercepted telephone calls.

Mr. Gonzalez reached out to multiple sources of supply. He ultimately found a supplier that was willing to provide the 3 kilograms of cocaine -- an individual we haven't fully identified yet at this time.

Once Mr. Jackson arrived in Houston, Mr. Gonzalez directed him to meet with his supplier's courier to pick up the 3 kilograms of cocaine.  He initially went to a condo complex right by the Galleria.  During that time, the courier had identified one of the surveilling agents inside the parking garage and the location was moved.

Once the location was moved, we were unable to perceive where they went.  The conversation at that point were

between the supplier and Mr. Jackson; whereas Mr. Gonzalez was no longer in the picture, so we weren't intercepting the call.  However, after maybe an hour or so, we did intercept calls from Mr. Jackson to Mr. Gonzalez where Mr. Jackson confirmed he had obtained the cocaine.

He had complained that a couple of the bags were open. He also had mistakenly forgot to drop off one of the bags of money that was needed to pay for the cocaine.

Q    Okay.  And just to orient the Court, around what time frame was this when this deal was going down?

A    I believe, it was in June of 2021.

Q    So around June 23rd of 2021 --

A    It may have been --

Q    -- was when this happened?

A    -- it might have been -- yes, ma'am.

Q    Okay.  And then, so you know, were investigators able to actually see Mr. Jackson arrive in Houston for this deal that you have been intercepting over the telephone calls?

A    Yes, ma'am.  We observed both Mr. Jackson and Mr. Ford. They were driving in two separate vehicles when they arrived into the initial meet location by the Galleria.

Q    Okay.  And then, was there any discussion on the telephone calls between Mr. Jackson and Mr. Gonzalez about what amount of money was going to be delivered by Mr. Jackson?

A    Yes.  The initial payment for the 3 kilograms of cocaine was 90,000; however, there was a prior drug debt that Mr. Jackson owed.  I believe, it was like 49,000, maybe 49,500.  Mr. Jackson, I believe, had delivered a hundred and five thousand, but as I said previously, one of the bags of money he forgot to transfer over, which we believe was about 20,000 which we later seized a few weeks later.

Q    Okay.  Well, can you tell the Court about that?  What was the 20,000 that was seized?

A    So the remaining amount of money that was still owed, Mr. Gonzalez was being pressured by his Mexico suppliers to collect that money.  Mr. Gonzalez, then, reached out to a Co-Defendant in this case, Raul Ruiz Trevino.

They agreed to send two couriers to Alabama to meet with Mr. Jackson and inquire of the remaining 20,000.  They sent two couriers, which was Raul Ruiz, III, and Sylvester Alvarez, who traveled from Rio Grande City, Texas all the way to Alabama; and once they arrived, everything was coordinated over the phone which we were intercepting the calls.

Mr. Gonzalez had Mr. Jackson meet with those two couriers, hand off the money.  Mr. Gonzalez had previously instructed the couriers to conceal the money inside of an ice chest filled with fish.  They even said they believed that, you know, with it filled with fish, that -- so if law

enforcement stopped them, they wouldn't bother going through an ice chest full of fish.

Once they picked up the money from Mr. Jackson, they departed, started heading back towards Texas, South Mississippi Metro Enforcement Team conducted a traffic stop on the two couriers where they located and seized the 20,000 inside of an ice chest full of fish.

Q    Okay.  And just to clarify, was that discussion about putting that money in an ice chest with fish, who were the ones discussing that?

A    It was pretty much everyone -- Mr. Gonzalez, and Mr. Ruiz; and also, once the couriers had arrived at Mr. Jackson's location, Mr. Gonzalez had asked Mr. Jackson if there was a local fish market or a place where they could purchase the fish.

Q    Okay.  So that phone call where there is discussion of fish on top of the money, that was also a phone call that occurred between Mr. Jackson and one of the other co-conspirators?

A    With Mr. Jackson and Mr. Gonzalez, yes.

Q    Okay.  And then ultimately, when that money was found and seized, was it $20,000?

A    Yes, ma'am.

Q    And was it hidden with some fish?

A    Yes, ma'am.  It was in an ice chest full of fish.

Q    Okay.  Great.  And so what was the time frame of that second money laundering transaction?  Was that July 15th of 2021?

A    Yes, ma'am.  It was July 2021.

Q    Okay.  And so does that conclude basically the transactions that Mr. Jackson was involved in, in your investigation?

A    Yes, ma'am.  Those were it.

Q    Okay.  And then further, as part of your investigation, did you look into Mr. Jackson's history and background?

A    Yes, ma'am.

Q    Okay.

A    I ran his criminal history.

Q    In looking at Mr. Jackson's criminal history, did you notice any convictions specifically with respect to drug trafficking?

A    Yes, ma'am.  I saw two prior convictions for conspiracy to possess with intent to distribute:  One was for cocaine, and the other, I believe, was for marijuana.

Q    Okay.  And both of them were federal convictions?

A    Yes, ma'am.  I'm sorry.  Federal conspiracy to posses with intent to distribute.

Q    In addition, did he have other felony convictions in state court as well?

A    Yes, ma'am.  There were about handful, maybe, a little

less than a handful.

Q    Okay.  And so based on your review of the history of Mr. Jackson, did it seem that he had a history of drug trafficking?

A    Yes, ma'am.  Yes.  I mean, this was over the course of a couple of decades, these charges and convictions.

Q    Okay.  All right.

        MS. LU:  Your Honor, at this point, I have no further questions for this witness.  I pass the witness.

        THE COURT:  Thank you.

        Mr. Valles, do you have any Cross-Examination?

        MR. VALLES:  Yes, Your Honor.  Thank you, Your Honor.

        May I proceed?

        THE COURT:  Certainly.

        MR. VALLES:  Thank you.

        CROSS-EXAMINATION OF JAMES EMMERSON

BY MR. VALLES:

Q    Mr. Emmerson, I just had a few questions.

A    Yes, sir.

Q    With your interactions in your investigation regarding my client, Mr. Jackson, did you ever come into any personal contact with him?

A    No, sir.

Q    Okay.  When he was apprehended in -- excuse me -- in

Alabama, did you ever go out there and were you ever a part of that apprehension at all?

A    I was a part of it as far as assigning the team assignments and coordinating with the Marshals out there and providing them the arrest warrant, the information about Mr. Jackson, his last known address; but as far as, like, physical presence, no, I did not physically go out there.

Q    Okay.  Did you have any issues when it came to locating Mr. Jackson that you heard of or --

A    No, sir.  No, sir.  I never heard of any issues, and I believe, he was placed in custody early on that day just like the others that there were no incidents.

Q    Okay.  Was it difficult for you to be able to ascertain his address or locate where he is so the other agents can go apprehend him?

A    No, sir.  It wasn't.

Q    Okay.  And it was never reported to you that he was combative or anything of that nature with the other agents?

A    No, sir.  I never heard of what happened, but if an issue like that would have happened, I'm sure they would have told me, and I was never told anything about that.

Q    Okay.  As far history, you said you looked up his history, and yes, there is multiple arrests and convictions for drug trafficking.

Do you recall anything of any violent nature at

all?

A     No, sir.  I don't think so.

Q     Okay.

          MR. VALLES:  Pass the witness, Your Honor.

     (Witness passed.)

          MS. LU:  Your Honor, I have no Redirect.

          The only thing that I would offer at this point is the Pretrial Services Report in this case.  I believe -- actually, I received two, Your Honor.  I have a Pretrial Services Report prepared for this case, but I also have additional information on a, it looks like, Amended Pretrial Services Report that was created for Mr. Jackson's prior conspiracy to possess with intent to distribute marijuana case.

          And so if the Court would allow, I would like to offer both of those.

          THE COURT:  Yes.  I have both of them before me. One was based on an interview March 2, 2022, and the prior one, the amended report, dated March 7, 2012.  I am taking judicial notice of both reports.

          MS. LU:  Thank you, Your Honor.  And with that, the Government rests.

          THE COURT:  Thank you.

          Mr. Valles, you have any evidence you would like to present?

MR. VALLES:  No, Your Honor.  None at all, Your Honor.  Just we would -- actually we go along with what's offered in the reports, as well, Your Honor.

THE COURT:  All right.  Then let's proceed to argument.

Ms. Lu, you may begin.

MS. LU:  Yes, Your Honor.

THE COURT:  Just give me one moment.

Mr. Emmerson, thank you for your testimony.  You are excused.

(Witness excused.)

MR. LU:  Thank you, Your Honor.  I forgot to ask.

All right.  Your Honor, in looking at the factors that are set out in 18 U.S.C. § 3142(g), the factors to be considered when considering the detention issue.  Your Honor, I believe all of the factors point to detention for this Defendant.

If you look at all the factors in turn, if you look at the first one, it inquires whether the nature and circumstances of the offense charged is, you know, a serious offense, and one of them involves a crime that involves a controlled substance.

Your Honor, you have heard, not only throughout the history of this Defendant, but throughout his interactions in this investigation that he was only

laundering money for the purpose of engaging in controlled substance trafficking.  That is cocaine trafficking.

And so this is a very serious charge that is actually an offense involving a controlled substance and meets that first factor.

Second, Your Honor, if you look at the weight of the evidence against Mr. Jackson, Your Honor, the evidence is strong.  He's on phone calls describing theses drug deals he's doing.  He was spotted by a surveilling agent in Houston bringing money for cocaine and then bringing money back.  There are phone calls that confirm that.

There is no doubt that he is the person who engaged in this money laundering, and you know, to assist this was cocaine trafficking.

Your Honor, the strongest factor against the Defendant for detention is the third one, the history and characteristics of the person.  Specifically, Your Honor, Mr. Jackson is just someone who whenever he's out in the free world, he returns to drug dealing over and over.

Your Honor, from the age of 24, if you look at his pretrial report, he was charged with a state violation of the Georgia Controlled Substances Act.  He also possessed a firearm during the commission of that crime.  He was placed on probation for that in '97, and within the next year, he got charged with a disorderly conduct; but more importantly,

another -- this time a federal -- controlled substance charge.

Your Honor, he, while on probation for that state charge, distributed a controlled substance.  He was charged federally in Alabama and was sentenced to 91 months in prison.

When he got out on supervised release, he continued his pattern of continuing to engage in crime, and his supervised release was revoked in, it looks like, 2005 for a local state charge for failure to obey a police officer.

And then, he continued on supervised release and then it was revoked again when he was found in -- although he was not -- the charges were declined -- he was found as a felon-in-possession in Houston -- Pasadena, and that was what caused, I believe, his supervised release to be revoked, and he served more time -- 48 months -- in BOP custody.

Your Honor, after he was released from that, he came out into the free world, and once again, committed another drug trafficking offense.  He was convicted in Mobile, Alabama of conspiracy to possess with intent to distribute marijuana, and for that, he was sentenced to 21 months in prison and about four years supervised release.

So his supervised release had just expired in 2019

when he got back into the drug dealing game.  Your Honor, you heard in the testimony of Officer Emmerson that, that one transaction in June of 2021 wasn't the first one.  He owed a drug debt meaning that he had previously been drug dealing, and this was something that he was not shy about crossing state lines to do.

He made trips to Houston to collect cocaine and drop off money.  He coordinated money collections from people from down in the Valley all the way in Alabama.  This is a Defendant who is very ingrained in the drug trafficking game, and any time that he is out on bond, he is going to go back to drug trafficking.

And so I think, Your Honor, if you look at factor (3) of Section (g) of 3142, that really points the Court towards detention of this person.

And then, finally, Your Honor, with respect to factor (4), the nature and seriousness of the danger to any person in the community that would be posed by the Defendant's release, Your Honor, I think it's very clear that the danger is posed by this continued drug dealing. This is also a Defendant who had in the past had a gun while he commits his drug trafficking crimes.

And so I think, you know, his consistence, his willfulness on continuing to deal drugs creates this danger to the community and he has shown time and time again that

he will return to drug dealing any time he's out.

And so it's for all those reasons and the factors in Section (g) of 3141 that we ask for detention.  We don't believe there is a condition or a combination of conditions that can ensure the safety of the community.

Thank you.

THE COURT:  Thank you, Ms. Lu.

Mr. Valles?

MR. VALLES:  Yes, Your Honor.

Now, while there is no debating my client's criminal history, I will basically, hang our hat on two factors, Your Honor, as it relates to "Is this person a danger to society and what is the risk of nonappearance?"

As you heard from the agent himself today that my client was not difficult to find.  Even though he was in other state, there was no difficulty in locating him and ascertaining where he was, and even picking him up.

If you look through the history (indiscernible), there was nothing involving flight or nonappearances of any charges at all whatsoever.

It's also stated in the report, my client has never held a passport, nor has he ever traveled abroad.  So this is, I believe, a sign of where, yes, he has a criminal background, but he's always appeared, he's always handled his -- faced his days in court.  So I believe he is not a

flight risk.

As far as for a danger to society, yes, while he has criminal history that's all drug related, Your Honor, none of it are crimes of violence.  The one gun charge that he pled guilty to is almost 20 years ago when he was 24 years old, Your Honor.  The one charge from 2007 was dismissed by the -- where he was arrested by the Pasadena Police Department -- that case was not -- but basically the Harris County District Attorney's Office decided not to pursue charges on that.

So outside of one gun possession charge, which goes back to his early 20s, at least 20 years ago, Your Honor, he has not had anything weapon related or anything violent related at all.

So under those two vital points, Your Honor, we're asking the Court to consider to not detain my client while we work through this criminal process, Your Honor.

THE COURT:  Thank you.

Ms. Lu, I'll give you last word, but I have a question for pretrial.

MS. LU:  Yes, Your Honor.  I think, Your Honor, it's clear from the pretrial report, especially given that we have the opportunity to have two of them, this is a Defendant who does not have ties to the community.

One slight correction that I would like to make is

that it looks like on the Amended Pretrial Report from 2014, he does actually have one failure to appear on his traffic charges.  That is mentioned at the very bottom of the Defendant's criminal history.

But that being said, Your Honor, I think, he does not have people in his life who will keep him from doing what he's been doing, which is returning to this life of dealing drugs.

I think, that is evident in 2014.  It's evident in 2021 and 2022, Your Honor.  This is somebody who will return to it -- return to dealing drugs and the only way the United States, the Court, can keep the Defendant from doing that is by detaining him.

THE COURT:  Ms. Derrick?

DEFENDANT JACKSON:  Yes, Your Honor.

THE COURT:  Yes.  No.  I'm sorry.  I'm talking to the probation office.

DEFENDANT JACKSON:  I am so sorry.

THE COURT:  That's all right.

MS. DERRICK:  Yes, Your Honor?

THE COURT:  I have a question on the --

MS. DERRICK:  Yes.

THE COURT:  -- 2022 report, I know that your department did not create this, but I am wondering if you can clarify in probation-speak what this means.

At the bottom of page 3, there is a mention of this charge in Pasadena for a felon-in-possession of a firearm, and in the right column, disposition, it says:

"Defendant was released from custody for FCTX collateral response. Harris County District Attorney's Office declined to press charges."

Is that an -- what does that mean to you? I understand --

MS. DERRICK: So --

THE COURT: -- that because the federal -- because the federal government was using this as a basis for revocation, they chose to -- the State chose not to press charges.

MS. DERRICK: If they are arrested in other districts and states, and they have federal conditions, then they can send the collateral request to, like, our office for us to investigate what happened on that case since they may not have access to the State records.

So somebody in our office would have looked at Harris County court records and seen that they declined to press charges, and then, notified the Alabama District.

THE COURT: I see. So it's basically reflecting communications with your department here in the Southern District of Texas.

MS. DERRICK: Yes, Your Honor.

THE COURT: All right. Is there anything else? Why don't we take five minutes, and I'll come back on the Record and give you my findings.

UNIDENTIFIED SPEAKER: (Speakers talk at the same time.

MS. LU: (Glitch in audio), Your Honor.

THE COURT: Mr. Jackson, anything you want to say?

DEFENDANT JACKSON: Yes, ma'am. Yes, ma'am. I was -- I know that she said that I had a failure to appear that I have no -- I have no -- I can never have a failure to appear within the Court conditions. I always showed up.

And also dealing with that gun, there, I mean, maybe, they dropped because the gun wasn't mine. The gun was someone else's, and I did not know the gun was there, but I mean, evidently, it was there, but I didn't know and that belonged to someone else.

And with them saying that I have no ties to the community, I do have ties to the community. I mean, I'm very much involved in the community. I mean, I'm a coach there at the City Park. I mean, and I do citizen work there in my community, and I'm also part of the -- joined with the church, and I mean, I have a family. I mean, I'm a father, a husband.

Since this past year, and I mean, things have really, really changed for me since. I mean, my last

conviction, I mean, I have started --

MR. VALLES:  If I may?  If I may, Mr. Jackson? Before you start going into past things, we just ask you remain silent, please.

MR. JACKSON:  Yes, sir.

THE COURT:  All right.  We'll take a five-minute recess, and I'll be back with my findings.  Thank you.

MS. LU:  Thank you, Your Honor.

(Recess taken at 10:36 a.m. to 10:42 a.m.)

AFTER RECESS

THE COURT:  We are back on the Record.

Mr. Jackson, before I announce my findings, first of all, I want to emphasize that you are entitled to presumption of innocence.  Nothing that happens in this hearing or that I might indicate in my findings will affect that presumption.

Instead, the purpose of this hearing is just to determine whether, notwithstanding that presumption of innocence, that you should be detained pending trial.

Second of all, under the Bail Reform Act, pretrial detention is an exceptional step.  The Court is required to release you pending trial, unless there is no condition or combination of conditions that exist that would reasonably assure your appearance in these proceedings or reasonably assure the safety of the community.

That said, I conclude under the evidence presented today, that you are to be detained pending trial.  The factors that I am required to consider in this case all weigh in favor of detention.

First of all, the underlying charge, although not a presumption case, is nonetheless a serious offense that advances drug trafficking, and specifically, cocaine trafficking.

The weight of the evidence is extremely strong here because it consists of a series of wiretaps in which you are heard engaging in narcotics trafficking activities and the firsthand observations of agents that were surveilling the exchanges.

And importantly, given your prior criminal history of repeated drug-related offenses starting from age 24, and particularly, violations of probation and supervised release, you know, causing the revocation of both on numerous occasions also engaged in the same pattern of drug dealing.

It's a strong indication that there is no condition or combination of conditions that I can impose that would reasonably assure the safety of the community and your appearance at trial.

And finally, the nature and seriousness of the danger posed is evident from the type of and the nature of

the activities that are charged in this case.

You know, whether it's money laundering or direct drug dealing itself, both pose an inherent danger to the community.  There are past gun-related charges, although, one of them is, you know, fairly remote, but it is -- on balance, all of these factors leave me no choice but to order your detention pending trial.

Is there anything else that we need to address today?

MS. LU:  Your Honor, I'm not sure if this Defendant has been arraigned, and I do not know if he is ready for that.  I'm not certain if that has happened or not.

THE COURT:  Mr. Valles, would your client like to proceed with Arraignment today, or do you need to have more time to discuss?

MR. VALLES:  We can proceed with Arraignment, Your Honor.

THE COURT:  All right.

THE CLERK:  I believe he was already arraigned.

MR. VALLES:  Actually, yes.  Yes.  On Monday.

THE COURT:  That's right.  We did go ahead and Arraignment, and (indiscernible).  That's all right.  You weren't there Ms. Lu.

MS. LU:  I'm so sorry.

THE COURT:  No.  Not at all.  Not at all.  It was just a belt and suspenders.  All right.

Well, then, Mr. Valles, anything else that we should address today?

MR. VALLES:  No, Your Honor.

THE COURT:  All right.

With that, you are excused.  Thank you very much.

MS. LU:  Thank you, Your Honor.

MR. JACKSON:  Thank you.

MR. VALLES:  Thank you.

(Proceedings adjourned at 10:45 a.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/video/telephonic proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #65933*

*DATE FILED:  JUNE 21, 2022*